UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**JAMES LAMAR HENDERSON,**

**Plaintiff,**

**v.** **Case No. 24-CV-878**

**DR. GEORGE MONESE,** ***et al.***

**Defendants.**

---

**DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

James Lamar Henderson, who is incarcerated and representing himself, sues Dr. George Monese, Dr. Marley Kercher, and Nurse Karin Zodrow, under 42 U.S.C. § 1983, alleging that they failed to inform him of the side effects of risperidone and failed to adequately treat those side effects in violation of the Eighth Amendment. The defendants move for summary judgment.(Docket # 30.) For the reasons stated below, the defendants' motion for summary judgment is granted and the case is dismissed.

## FACTS

The facts are largely undisputed. From June 22, 2023, to February 3, 2025, Henderson was housed at the Wisconsin Resource Center ("WRC"). (Docket # 32, ¶ 1.) Dr. George Monese is a psychiatrist manager who works at WRC and is employed by the Wisconsin Department of Health Services ("DHS"). (*Id.*, ¶ 3.) Karin Zodrow was employed as an advanced practice nurse prescriber ("APNP") by DHS and worked at WRC from July 2021 to June 2024. (*Id.*, ¶ 5.) Dr. Marley Kercher is currently the medical director at WRC

and worked as a psychiatrist at WRC from July 2020 until her promotion to medical director in March 2024. (*Id.*, ¶ 7.)

Henderson transferred to WRC from the Wisconsin Secure Program Facility ("WSPF") on June 22, 2023. (*Id.*, ¶ 9.) The transfer to WRC followed an incident on June 20, 2023, "during which Henderson stabbed himself in the neck with a pen causing injury to the branch of the anterior jugular artery." (*Id.*)

*Dr. Monese's and Zodrow's Treatment of Henderson*

Zodrow first examined Henderson on June 23, 2023, when he was admitted to WRC. (*Id.*, ¶ 14.) Zodrow observed "Henderson's affect was paranoid, his attention and concentration were interrupted throughout my encounter with him, his thought process was delusional, there were active psychotic symptoms at the appointment, he did not appear to be distracted by internal stimuli, he did not have current suicidal or homicidal ideations, he looked to be paranoid with some delusional thinking." (*Id.*) He also had auditory hallucinations and poor judgment. (*Id.*)

Zodrow decided to consult with Dr. Monese "because she felt Henderson could benefit from a Chapter 51 commitment due to his current psychosis, self-harm/suicide attempt, and refusal of psychiatric medications." (*Id.*, ¶ 15.) After meeting with Zodrow, Dr. Monese reviewed Henderson's medical records and then went to the housing unit to meet with Henderson. (*Id.*, ¶ 17.) During that meeting, Henderson would not engage in conversation, despite several efforts on Dr. Monese's part. (*Id.*) Dr. Monese noted that "Henderson was alert and oriented and responded when called by his name. Henderson vehemently shook his head when asked if he would take some medications to alleviate

stress." (*Id.*, ¶ 18.) Dr. Monese informed Henderson of his patient rights and legal rights and gave him an opportunity to sign acknowledging the rights, but Henderson refused. (*Id.*)

In Dr. Monese's opinion, he "agreed with Zodrow's preliminary diagnosis of unspecified psychotic disorder." (*Id.*, ¶ 19.) He also felt emergency treatment was warranted and recommended proceeding with a Chapter 51 commitment petition. (*Id.*, ¶¶ 19–20.) Dr. Monese then "requested a petition for examination and civil commitment and involuntary medication order based on [his] diagnosis that Henderson suffered from unspecified psychotic disorder, and his opinion that he continued to have a substantial disorder of thought, mood, and perception that grossly impaired his judgment, behavior, and capacity to recognize reality." (*Id.*, ¶ 22.) Dr. Monese further "opined that Henderson was dangerous because he evidenced a substantial probability of physical harm to himself." (*Id.*, ¶ 24.) Dr. Monese requested an involuntary medication order because in his opinion, Henderson "was not capable of expressing an understanding of the advantages and/or disadvantages of accepting medications or treatment and the alternatives, and he was substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to his mental illness in order to make an informed choice as to whether to accept or refuse medication or treatment." (*Id.*, ¶ 25.)

While pursuing the Chapter 51 commitment, Dr. Monese continued to monitor Henderson, including meeting with him and getting reports from "frontline staff." (*Id.*¶¶ 26–27.) Henderson continued to refuse medication, was reclusive, and would not cooperate or interact with staff. (*Id.*, ¶ 27.)

A hearing on the order for involuntary medication and treatment was held on July 5, 2023, at the Winnebago County Circuit Court. (*Id.*, ¶ 29.) At the hearing the circuit court

ordered that "medication and treatment may be administered to Henderson, regardless of his consent, until the final hearing in the matter." (*Id.*)

On July 5, 2023, Zodrow visited Henderson's cell to inform him that the circuit court ordered that involuntary medications could be administered. (*Id.*, ¶¶ 30–31.) Henderson did not respond. (*Id.*) Zodrow also asked about Henderson's history with antipsychotics, including any that he did well on, and Henderson refused to answer. (*Id.*, ¶ 31.) Zodrow then informed Henderson that he would be placed on risperidone. (*Id.*, ¶ 32.) Zodrow "discussed the risks and benefits of the medication including, but not limited to, headache, dizziness, nausea, vomiting, blood pressure changes, tachycardia, sedation, constipation, high blood sugar, high cholesterol, akathisia, and increased weight." (*Id.*) Henderson ignored Zodrow. (*Id.*) Zodrow states she does not recall if she mentioned the possibility of gynecomastia, which is an increase in the amount of breast or gland tissues in males. (*Id.*, ¶ 33.) Henderson states he does not recall this conversation, but if it did occur, he states gynecomastia was never discussed as a possible side effect. (Docket # 48, ¶ 32.) Zodrow then started Henderson on 2 mg of risperidone, administered by a dissolving tablet to establish tolerance. (Docket #32, ¶ 35.) Once Henderson built up a tolerance, he would receive "a long-acting risperidone injection." (*Id.*)

On July 7, 2023, Zodrow saw Henderson for a follow-up visit. (*Id.*, ¶ 36.) Henderson refused to cooperate with her. (*Id.*) Zodrow "provided education to Henderson including encouragement of therapeutic lifestyle changes to promote mood and general sense of well-being including, but not limited to, adequate hydration, healthy diet, adequate sleep, good sleep hygiene, limit caffeine intake, and regular exercise." (*Id.*, ¶ 38.) Zodrow told Henderson to submit a health service request ("HSR") if he had any questions or concerns.

(*Id.*) Zodrow also again discussed the most common side effects of psychotropic medications. (*Id.*, ¶ 39.) Henderson "acknowledged understanding of the treatment plan" and he did not have any questions or concerns. (*Id.*, ¶ 40.)

On July 19, 2023, Henderson stipulated to the commitment and the treatment conditions, which the circuit court ordered and entered on July 20, 2023. (*Id.*32, ¶ 43.) The circuit court ordered the following:

> a. Henderson committed to the care and custody of DHS,
> b. Treatment authorized on an outpatient basis at WRC,
> c. Involuntary administration of medications to Henderson,
> d. Commitment commenced on July 20, 2023.

(*Id.*, ¶ 44.)

On July 25, 2023, Zodrow again examined Henderson, and Henderson "reported his mood was 'good' and he denied any side effects." (*Id.*, ¶ 47.) Henderson asked if he could get the risperidone injection once a month instead of bi-weekly, and Zodrow explained that it needed to be administered every two weeks. (*Id.*) Henderson stated "oh, that's no problem." (*Id.*)

On August 22, 2023, Zodrow saw Henderson, who stated his mood was "all good." (*Id.*, ¶ 48.) Henderson stated he did not have any side effects and he did not have concerns about his lifestyle, weight, diet, or other physical issues. (*Id.*)

Between June 22, 2023, when he was admitted to WRC, to September 11, 2023, Henderson's weight went from 136.4 lbs. to 206.2 lbs. (*Id.*, ¶¶ 21, 49.) Henderson also had lab work in September 2023, and the results "showed low HDL cholesterol, high LDL cholesterol, high triglycerides, among other things." (*Id.*, ¶ 50.) Dr. Hermitanio diagnosed Henderson with dyslipidemia, "which is a condition characterized by abnormal levels of

lipids (fats) in blood." (*Id.*, ¶ 51.) He recommended that Henderson monitor his diet and see the dietician. (*Id.*) Henderson declined to see the dietician. (*Id.*)

On September 26, 2023, Zodrow met with Henderson, where Henderson reported his mood was "alright." (*Id.*, ¶ 52.) Henderson stated he did not have any side effects or any other concerns. (*Id.*, ¶ 53.) He did ask what would happen when the court order expired in January 2024. (*Id.*, ¶ 52.) Also at the appointment, Zodrow explained to Henderson the benefits he was experiencing from being on risperidone, "including a significant decrease in mood fluctuations, paranoia, and self-harm." (*Id.*)

Zodrow examined Henderson again on November 7, 2023, and Henderson noted his mood was "good." (*Id.*, ¶ 55.) Henderson stated he did not have any side effects or any other concerns. (*Id.*)

On December 19, 2023, Zodrow met with Henderson, and Henderson reported "everything is all good." (*Id.*, ¶ 56.) Henderson stated he did not have any side effects or other concerns. (*Id.*) He also stated he was sleeping well. (*Id.*) Zodrow states that Henderson never complained to her about any side effects regarding risperidone or made any complaints related to gynecomastia. (*Id.*, ¶ 57.)

*Dr. Kercher's Treatment of Henderson*

Dr. Kercher first examined Henderson on December 4, 2023. (*Id.*¶ 58.) Part of her examination was to consider whether to extend the Chapter 51 commitment. (*Id.*) She observed that Henderson was "organized without psychotic symptoms." (*Id.*, ¶ 59.) She further opined that the change in Henderson's "demeanor and behavior was to be most assuredly due to his continued treatment with psychotropic medications under his court order." (*Id.*) She also observed that "Henderson displayed lack of insight into his underlying

mental health condition and symptoms and the recommended need for ongoing treatment." (*Id.*) As a result, she petitioned for an extension of his commitment and involuntary medication order. (*Id.*) She informed Henderson of the petition, read him his legal and patient rights, and Henderson signed acknowledging those rights. (*Id.*, ¶ 60.) She further discussed the benefits and risks of psychotropic medications "including but not limited to, weight gain, sedation, metabolic syndrome, movement disorder, dry mouth, rare reduction in seizure threshold, and rare hematologic perturbations (blood disorders)." (*Id.*, ¶ 61.)

On January 8, 2024, Dr. Kercher had a follow up appointment with Henderson, and Henderson reported that he was "feeling good." (*Id.*, ¶ 63.) Henderson complained that he had been gaining weight since starting his medications, and he had concerns about the weight gain. (*Id.*) Other than the weight gain, Henderson had no complaints about side effects. (*Id.*) Dr. Kercher discussed possible lifestyle changes or medication for weight management. (*Id.*, ¶ 64.) Henderson noted that he exercised regularly, but he agreed to start taking the weight management medication. (*Id.*, ¶ 65.) Dr. Kercher also recommended that Henderson continue on risperidone because "he had shown dramatic improvement with this regimen, presenting as organized and calm and not displaying or reporting any psychotic symptoms." (*Id.*, ¶ 66.)

On March 30, 2024, Henderson submitted an HSR "reporting an increase in breast size" and "increased 'flabbiness' in his chest and nipple sensitivity." (*Id.*, ¶ 67.) He also reported some chest/pectoral pain. (*Id.*)

On April 2, 2024, Dr. Lesko, a senior psychiatry resident working under Dr. Kercher's supervision, examined Henderson in response to his March 30 HSR. (*Id.*, ¶ 68.) At the appointment, Henderson "expressed concerns about his breasts being "flabby" and

"having 'extra tissue.'" (*Id.*) He stated that he noticed these changes in January shortly before starting the weight management medication. (*Id.*) Henderson was informed that he needed a blood draw to test his prolactin levels; prolactin is a hormone that stimulates breast milk production, regulates metabolism, and supports the immune system. (*Id.*, ¶¶ 68–69.) Normal prolactin levels in males are less than 20 nanogram/milliliter (ng/mL). (*Id.*, ¶ 69.) Dr. Lesko and Henderson also discussed alternatives to risperidone because it can raise prolactin levels. (*Id.*, ¶ 72.) Specifically, they discussed Abilify, because it is considered to be "more weight neutral" than other antipsychotics. (*Id.*) Henderson stated that he was willing to try Abilify. (*Id.*)

Henderson had his blood drawn on April 3, 2024, and it "showed mildly elevated prolactin." (*Id.*, ¶ 74.) Dr. Kercher met with Henderson on April 10, 2024, and discussed the results of his blood work, noting that his prolactin was mildly elevated at 37.8 ng/mL. (*Id.*, ¶ 75.) It was decided that Henderson would discontinue using risperidone and switch to Abilify. (*Id.*, ¶ 76.)

On April 19, 2024, Dr. Lesko examined Henderson, and Henderson reported feeling "good" after switching to Abilify. (*Id.*, ¶ 78.) Henderson stated he was not experiencing any side effects. (*Id.*) Henderson requested that he stay on oral Abilify instead of switching to injections. (*Id.*, ¶ 79.)

On May 28, 2024, Dr. Kercher met with Henderson to discuss his concerns about gynecomastia. (*Id.*, ¶ 81.) Gynecomastia is known to be a rare side effect of risperidone. (*Id.*, ¶ 84.) After a physical examination of Henderson's torso, Dr. Kercher "did not observe any significant gynecomastia on visual inspection or palpation." (*Id*, ¶ 86.) She did observe excess body fat on his torso, "but it was symmetric and not consistent with breast tissue."

(*Id.*) Dr. Kercher recommended that Henderson's prolactin levels be rechecked. (*Id.*, ¶ 90.) She also discussed putting Henderson back on weight management medication, but Henderson declined. (*Id.*, ¶ 91.) She further recommended an appointment with a dietician, which Henderson also declined. (*Id.*)

On June 17, 2024, Dr. Hermitanio examined Henderson and noted "some degree of gynecomastia with no palpable lump" and no discharge. (*Id.*, ¶ 93.) Dr. Hermitanio described Henderson's condition as "residual mild gynecomastia." (*Id.*)

On June 24, 2024, Dr. Lesko examined Henderson, who reported "chest/breast pain" that "worsened with pressure and taking his shirt on and off." (*Id.*, ¶ 94.) Henderson stated that over-the-counter pain medications or "muscle rub" did not relieve the pain. (*Id.*) Dr. Lesko informed Henderson that Dr. Kercher did not find evidence of gynecomastia and that his most recent prolactin levels, taken on May 31, 2024, were at 5.4 ng/mL. (*Id.*) She ordered topical lidocaine to help with pain management. (*Id.*)

On June 28, 2023, Henderson submitted an HSR stating "the ice and heated towel treatment is not working for my chest pain. I'm still in severe pain." (*Id.*, ¶ 96.) An unidentified nurse responded to the HSR by ordering Henderson 600 mg of ibuprofen to take along with Tylenol for his pain. (*Id.*, ¶ 97.) She further informed Henderson that his prolactin levels were back to normal. (*Id.*, ¶ 98.)

Sometime shortly before July 16, 2024, it is unclear from the record when, Henderson submitted another HSR stating, "my ibuprofen has expired I'm still taking Tylenol and using lidocaine cream. I'm telling y'all that it's [*sic*] ineffective and I'm still suffering from excruciating pain and irritation of my nipples." (*Id.*, ¶ 99.) Henderson described his pain as "a 10/10 stabbing sensation to his bilateral pectorals and nipples." (*Id.*)

He was examined by an unidentified nurse who requested an order for an updated prolactin level check and a follow up appointment. (*Id.*, ¶ 101.)

On July 18, 2024, Henderson had his blood drawn and the test results showed a prolactin level at 4.2 ng/mL, which is within normal range. (*Id.*, ¶ 102.) On August 6, 2024, Dr. Courtney Semotink, a senior psychiatry resident, and Dr. Kercher met with Henderson. (*Id.*, ¶ 103.) Henderson stated his mood was good and he's "never been better mentally." (*Id.*) However he "reported still having nipple irritation especially when he puts on shirt or sleeps on his stomach." (*Id.*) He was using lidocaine cream but did not find it very effective. (*Id.*) Dr. Kercher stated she did not know why Henderson was experiencing persistent nipple discomfort, but she offered to conduct another physical exam. (*Id.*, ¶ 104.) Henderson declined the physical exam, stating that he had another appointment with Dr. Hermitanio, and he would address the issue with him. (*Id.*)

On August 15, 2024, Dr. Hermitanio met with Henderson for an exam. (*Id.*,¶ 105.) Dr. Hermitanio "noted no noticeable definite gynecomastia." (*Id.*)

On October 4, 2024, Dr. Kercher met with Henderson, and Henderson requested to be on the lowest dose of his psychotropic medications as possible. (*Id.*, ¶ 106.) Dr. Kercher agreed and Henderson's dose was reduced. (*Id.*) On November 4, 2024, Dr. Kercher again saw Henderson and noted that he was doing well on the lower dose. (*Id.*, ¶ 107.) On November 18, 2024, Dr. Kercher met with Henderson, and they discussed "his ongoing myofascial pectoralis discomfort." (*Id.*, ¶¶ 109, 110.) Dr. Kercher prescribed Henderson 975 mg of Tylenol to take three times daily. (*Id.*, ¶ 110.)

Henderson was discharged from WRC on February 3, 2025, and he transferred to Oshkosh Correctional Institution. (*Id.*, ¶ 113.) Prior to his transfer, on January 6, 2025, Dr.

Kercher met with Henderson, and she noted that "Henderson had completed all groups and programs at WRC" and was ready to be transferred. (*Id.*, ¶ 111.)

Henderson does not dispute these facts. Additionally, he asserts that the defendants "should have protected Henderson from such side effects and medication such as risperidone [and] immediately go to a second-generation medication such as Abilify." (Docket #45 at 11.) He also states that he was definitively diagnosed with gynecomastia and "was in the beginning stages of growing breast[s]," which caused him psychological torture. (*Id.* at 10.) He acknowledges that the issue went away once he switched to Abilify but asserts that the psychological damage had already been done. (*Id.*)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*,

477 U.S. at 324. Evidence relied upon must be of the type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

**ANALYSIS**

Henderson claims that the defendants violated his Eighth Amendment rights when they failed to advise him that gynecomastia was a side effect of risperidone and when they failed to treat his gynecomastia and associated pain.

At the outset, § 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Hildebrant v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). Because § 1983 makes public employees liable "for their own misdeeds but not for anyone else's," *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009), a plaintiff must demonstrate that each individual defendant participated in the violation of his constitutional rights. Dr. Monese's involvement with Henderson was limited to obtaining the Chapter 51 commitment. Dr. Monese was not involved in the decision to put Henderson on risperidone, nor did he treat Henderson when he complained of gynecomastia. As such, he was not involved in the alleged constitutional violations. Summary judgment is granted in his favor.

Regarding the actions of Zodrow and Dr. Kercher, to establish a deliberate indifference claim under the Eighth Amendment, a plaintiff must demonstrate that there is "a risk of harm to the plaintiff that is so objectively serious as to be 'excessive' (and that risk must in fact materialize)." *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023). "[T]he defendant must 'know' of the risk (put differently, he must possess subjective awareness that the risk exists)." *Id.* Also, "the defendant's response to the risk must be so inadequate as to constitute 'disregard' of (or deliberate indifference toward) the risk." *Id.*

Henderson fails to establish that he experienced an excessive risk of harm. At most, he establishes that he had sensitivity and pain in his chest/pectoral area. While Henderson states that he was definitively diagnosed with gynecomastia, the evidence shows that Dr. Hermitanio characterized Henderson's condition as "residual mild gynecomastia.", (Docket #32, ¶ 93.) Dr. Kercher and her residents all opined that Henderson did not suffer from gynecomastia. (*Id.*, ¶¶ 68–94.) "[D]isagreements between medical professionals about the proper course of treatment rarely amount to deliberate indifference." *Riley v. Waterman*, 126 F.4th 1287, 1296 (7th Cir. 2025). Combined with the fact that Henderson produces no credible evidence that risperidone causes gynecomastia or even breast sensitivity, no reasonable factfinder could conclude that an excessive risk existed. He provides only a Google AI summary that lists some substances that cause gynecomastia, but notably, risperidone is not mentioned by name. (Docket # 47-1.) Regardless, an AI summary is not a trustworthy source of information.

Moreover, even if Henderson could establish that an excessive risk of harm materialized, no reasonable factfinder could conclude that either Zodrow or Dr. Kercher were deliberately indifferent to the risk. As for failing to disclose the potential side effects of

risperidone, Henderson cannot establish that Zodrow, when she decided to prescribe risperidone, knew that gynecomastia—or even elevated levels of prolactin—were considered an excessive risk of the drug. Without evidence that quantifies the risks of potential side effects of risperidone, "no rational factfinder could conclude that [the prescriber] ignored an 'excessive' risk to [the plaintiff's] health, even if she did not warn him about possible side effects." *Brown v. Felten*, 721 Fed. App'x 538, 540 (7th Cir. 2018) (determining that the plaintiff needed to establish that certain side effects of risperidone were known excessive risks.)

To the extent that Henderson is arguing that Zodrow was deliberately indifferent to his right to refuse medical treatment or was deliberately indifferent in prescribing him risperidone, he was not allowed to proceed on such claims. Chief Judge Pamela Pepper, who screened this case before all parties could consent to the jurisdiction of this Court, clearly stated that Henderson was allowed to proceed on an Eighth Amendment claim that the defendants "did not advise him of the side effects of Risperidone and did not adequately treat him for those side effects." (Docket #10 at 8.) Henderson is limited to the scope of the screening order. *See Werner v. Hamblin*, Case No. 12-CV-96, 2013 WL 788076, at *2 (E.D. Wis. Mar. 1, 2013).

As for Henderson's chest pain, no reasonable factfinder could conclude that either Zodrow or Dr. Kercher were deliberately indifferent. Henderson does not demonstrate that Zodrow was ever made aware of his complaints about chest pain, breast sensitivity, or weight gain. According to the record, Zodrow did not treat Henderson after December 19, 2023, and Henderson did not start complaining about pain and an increase in breast size until March 30, 2024. As such, summary judgment is granted in favor of Zodrow.

The earliest Dr. Kercher learned about Henderson's complaints would have been March 30, 2024, when Henderson submitted the HSR. (Docket # 32, ¶ 67.) Dr. Kercher's resident then examined Henderson within three days, on April 2, 2024, and a blood draw was ordered to test Henderson's prolactin levels. (*Id.*, ¶¶ 68–69.) Also at that appointment, it was decided to switch Henderson to Abilify. (*Id.*) Dr. Kercher then discussed the results of Henderson's blood draw on April 10, 2024, and by that point, Henderson was already on Abilify. Henderson cannot demonstrate that the delay in treatment caused his condition to worsen or suffer pain that would have been readily treatable. *See Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (stating that a delay in treatment may "constitute deliberate indifference if such delay exacerbated the injury or unnecessarily prolonged an inmate's pain") (citations omitted). Henderson complains that he suffered psychological harm because he was put on risperidone and not immediately taken off of it, but "an inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1034 (7th Cir. 2019) (quoting *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (emphasis in original)). As discussed above, Henderson presents no evidence that risperidone was the cause of his chest pain or psychological harm.

Henderson also cannot establish that Dr. Kercher was deliberately indifferent to his chest pain. Prison doctors are not subject to "the unrealistic requirement that doctors keep patients completely pain-free." *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 681 (7th Cir. 2023). When it comes to treating pain, a plaintiff must demonstrate that the medical professional "persisted in a course of treatment known to be ineffective," *id.* (quoting

*Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020)) or provide "evidence that defendants' recommended course of treatment was 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment,'" *id.* (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)). Every time Henderson reported pain, Dr. Kercher or her staff tried different methods and combinations of pain relief. Henderson provides no evidence that Dr. Kercher's decisions were "blatantly inappropriate medical treatment." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citing *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007)).

In short, Henderson provides no evidence on which a reasonable juror could reject Dr. Kercher's assessment. Courts "will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the [medical professional] actually was exercising his professional judgment." *Pyles*, 771 F.3d at 409. There is nothing in the record to suggest that Dr. Kercher's treatment of Henderson's chronic chest sensitivity was a significant departure from professional standards or practices. Summary judgment is granted in Dr. Kercher's favor.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. The defendants also argue that they are entitled to qualified immunity. Because the Court found in their favor on the merits, this argument need not be addressed. As there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (Docket # 30) is **GRANTED.**

**IT IS FURTHER ORDERED** that the case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 9th day of September, 2026.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge